THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND

APPLICATION AND AFFIDAVIT IN )
SUPPORT OF A WARRANT TO SEARCH )  Criminal No. 19-1306 ADC
FIFTEEN CELLULAR TELEPHONES AND )        _____ FILED _____ ENTERED
THREE ELECTRONIC DEVICES )               _____ LOGGED _____ RECEIVED
DESCRIBED FURTHER IN )
ATTACHMENT A, CURRENTLY LOCATED )        APR 29 2019
IN LAW ENFORCEMENT CUSTODY AT )          AT BALTIMORE
40 SOUTH GAY STREET, BALTIMORE, MD )     CLERK, U.S. DISTRICT COURT
                                         DISTRICT OF MARYLAND
                                         BY _____ DEPUTY

## APPLICATION AND AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

Your Affiant, Homeland Security Special Agent Joshua Gottschalk, deposes and states as follows:

1. This affidavit is submitted in support of search warrants for the following electronic devices:

Seized from 7 Tentmill Lane, Apartment K, Pikesville, Maryland, 21208 on April 4, 2019:

   a. One Rose Gold Samsung Cellular Phone; Model Number SM-J737P, IMEI# 354255098953492, ("Device #1");

   b. One Black ZTE Cellular Phone; Model # N9137, Serial # 320377233173, IMEI# 990008902451165 ("Device #2");

   c. One White Samsung Cellular Phone; Model # SM-J700P, DEC# 089483879105374065, HEX# 35562807520071 ("Device #3");

   d. One Black Samsung Cellular Phone; Model # SM-J727P, DEC# 089268864805595282, HEX# 35355908556092, (Device #4);

   e. One Silver LG Cellular Phone; Model # LS-770, DEC# 089663283806755159, HEX# 35718806671357, SN: 510CYBD0672157 ("Device #5");

   f. One White Samsung Cellular Phone; Model # SPH-L710, DEC# 256691513704748694, HEX# 99000441487596, ("Device #6");

   g. One Gold Samsung Cellular Phone; Model # SM-J320P, DEC# 089070874402119752, HEX# 35172308205848, ("Device #7");

1

    h.    One Black Samsung Cellular Phone; Model # SPH-M580, DEC# 268435460807001797, HEX# A00000306AD6C5 ("Device #8");

    i.    One Black Alcatel Tablet; Model # 9024W; IMEI: 014899004238944, ("Device #9");

    j.    One Black Amazon Kindle; IO: 9599A-0725, KCC-CMM: E48-D01100 ("Device #10");

    k.    One HP Laptop Computer; Model # HP255-G6, Serial # CND7510BWM ("Device #11");

<u>Seized from 4106 Liberty Heights Avenue, Baltimore, Maryland 21207, on April 4, 2019:</u>

    l.    One Black Alcatel TracFone; Model # A574BL; IMEI: 014913002557948, ("Device #12");

    m.    One Black Coolpad Cellular Phone; Model # Coolpad 3320A; IMEI: 867441022871428, ("Device #13");

    n.    One Silver Samsung Cellular Phone; Model # SM J327A; Serial # R28J43R0XRY, IMEI: 354775080845562, ("Device #14");

    o.    One White Samsung Cellular Phone; Model # SM J700T; Serial # R58H83ME8ZY, IMEI: 357218/07/545194/5, ("Device #15");

    p.    One White HTC Cellular Phone; Serial # FA4CASR04131, HEX: 99000501512619, DEC: 256691532905318169, ("Device #16");

    q.    One Black Samsung Cellular Phone; Model # SAMR800, #24702610067, #F727D393, ("Device #17");

    r.    One Black LG Cellular Phone (Flip Phone); Model # LG5600, #06803503627, #443576013, ("Device #18");

2.    Devices #1 through #18 are in the possession of agents of Homeland Security Investigations. They currently are located at 40 South Gay Street, Baltimore, Maryland. Your affiant submits that there is probable cause to believe that these electronic devices contain evidence of the conspiracy to distribute narcotics and

2

possession with intent to distribute and distribution of narcotics in violation of 21 U.S.C. §§ 846 and 841, respectively.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the search warrants, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. However, I have not excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

## **EXPERTISE**

4. Your affiant, Special Agent Joshua Gottschalk is a duly sworn member of the Department of Homeland Security Investigations (HSI). Your affiant is currently assigned to the Office of the Special Agent in Charge, Baltimore, Maryland, as well as, the Organized Crime Drug Enforcement Task Force (OCDETF), Strike Force in Baltimore, Maryland. Your affiant has been employed as a Special Agent with HSI since 2009. Your affiant completed the Criminal Investigator Training Program in Glynco, Georgia. Your affiant completed the Immigration and Customs Enforcement (ICE) Special Agent Training Program in Glynco, Georgia. Your affiant has received advanced training in drug investigations and money laundering investigations. Your affiant also received additional training in methods to trace illegal proceeds and prove financial crimes, asset forfeiture and financial investigations.

5. As a result of this training and experience, your affiant has learned about the importation, manufacture, concealment and distribution of controlled substances. Your affiant has also participated in a number of investigations of violations of Title 21 of the United States Code, which have resulted in the arrests and convictions of persons for violations of these laws. Your affiant is currently cross designated by DEA to conduct investigations under Title 21 United States Code. Your affiant has been the affiant on search and seizure warrants which have led to the seizure of items associated with drug trafficking, and documents relating to the distribution of narcotics. Your affiant has also participated in a wiretap investigation, including serving as a monitor in the "wire room."

6. As a result of these experiences, your affiant has become familiar with the use of telephones by drug traffickers to communicate, the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language and terms that are used to disguise the source and nature of the profits from their illegal drug dealings.

### INDICTMENT AND SEARCH WARRANTS

7. As discussed below, on March 20, 2019, the Grand Jury for the District of Maryland indicted **Gibran NELSON-SMITH**, under seal, for conspiracy to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, 28 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack cocaine"), and a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 846. (*CCB-19-0136*). This indictment has been unsealed and **NELSON SMITH** had his initial appearance and arraignment on April 5, 2019.

4

8. On April 3, 2019, U.S. Magistrate Judge Beth P. Gesner authorized federal search and seizure warrants on locations related to **NELSON-SMITH, Marvin MATTHEWS,** and their narcotics distribution organization. On April 4, 2019, pursuant to search and seizure warrants for 7 Tentmill Lane, Apartment K, Pikesville, MD and 4106 Liberty Heights Avenue, Baltimore, MD, investigators seized the aforementioned cellular telephones and devices.

## **PROBABALE CAUSE**

9. The following facts either are known personally to your affiant or have been relayed to me by other law enforcement officers. This is a summary that is not meant to include each and every fact known to me.

10. In August 2018, investigators received information from a confidential source (CS-1) indicating that Ricky Williams Jr. was murdered by two individuals over a dispute of $2,700 in drug proceeds owed to **NELSON-SMITH**. In September 2018, investigators received separate confidential source information (CS-2) also indicating that Williams was murdered by individuals over a dispute of $2,700 in drug proceeds. CS-1 also told investigators that **NELSON-SMITH** operates a drug shop in the alley next to the "White House" located at 3901 Dorchester Road, Baltimore, Maryland.

11. In December 2018, investigators utilized CS-1 on multiple occasions to conduct controlled purchases of narcotics with **NELSON-SMITH**.[1] Investigators initially would track **NELSON-SMITH**, via the GPS tracking device on his vehicle and then wait for the vehicle arrive in the area of Garrison Boulevard and Dorchester Road

---

[1] In order to protect the identity of CS-1, this affidavit does not go into detail regarding the specifics of the controlled purchases, such as the exact dates and times in which they were conducted.

5

where **NELSON-SMITH** operates a drug shop. Investigators then would observe through covert surveillance when **NELSON-SMITH** arrived in the alley next to the White House. Investigators then would meet with CS-1 and provide CS-1 with a sum of money to purchase the narcotics. Investigators would then have CS-1 go to the alley next to the White House and exchange the currency for narcotics. Investigators would equip CS-1 with a transmitter to monitor the conversations with **NELSON-SMITH** and his associates. Once the transaction was complete, investigators would meet with CS-1 at a predetermined meeting point to secure the narcotics. Investigators maintained visual surveillance of CS-1 before, during and after each narcotics transaction occurred. Lab results on the narcotics purchased through CS-1 tested positive for cocaine base as well as heroin and fentanyl.

12. In January and February 2019, investigators utilized an undercover officer (UC) to conduct multiple controlled purchases of narcotics from **NELSON-SMITH**. Prior to each of the UC controlled purchases, the UC would contact **NELSON-SMITH** on one of two different phone numbers known to investigators. The UC would contact **NELSON-SMITH** and **NELSON-SMITH** would designate a time and place to meet. Investigators observed, via GPS tracking on his vehicle, **NELSON-SMITH** depart 7 Tentmill Lane, Apartment K, Pikesville, MD 21208 in his vehicle and then travel directly to meet with the UC without making any stops in between. Prior to the controlled purchases, investigators equipped the UC with live audio and video recording devices to monitor the conversation with **NELSON-SMITH**. During each meeting, the UC provided a sum of cash to **NELSON-SMITH** who in turn provided the UC a specific amount of suspected narcotics. Lab results on the narcotics purchased through the UC

tested positive for cocaine base.

13. During the investigation into the narcotics distribution activity of **NELSON-SMITH**, CS-1 told investigators that Marvin **MATTHEWS**, also known as "PROP," had recently been distributing narcotics for **NELSON-SMITH** in the alley next to the "White House." **MATTHEWS's** identity was known to detectives of the Baltimore City Police Northwest District Action team through a prior March 27, 2018 arrest. In twenty out of the twenty-three arrests in **MATTHEWS's** criminal history, **MATTHEWS** has provided a home address of 4106 Liberty Heights Avenue, Baltimore, Maryland, including his most recent arrest on March 27, 2018.

14. Through a court authorized federal tracking warrant, investigators observed **NELSON-SMITH**, via GPS tracking on his vehicle, travel directly from his residence of 7 Tentmill Lane to **MATTHEWS'** residence of 4106 Liberty Heights Avenue. On January 18, 2019, investigators observed **NELSON-SMITH** pull up to **MATTHEWS's** residence and hand him a bag of what your affiant believes were narcotics for **MATTHEWS** to distribute in the alley next to the "White House."

15. Your affiant believes based on training and knowledge of this investigation that prior to traveling from 7 Tentmill Lane to 4106 Liberty Heights Avenue, **NELSON-SMITH** would contact **MATTHEWS** in order to let **MATTHEWS** know he would be delivering narcotics to him. Based on my training, knowledge, and experience, I believe there is probable cause to believe that Devices #1 through #18 will contain evidence related to **NELSON-SMITH's** narcotics trafficking activities.

### RELIABILITY OF CONFIDENTIAL SOURCE INFORMATION

16. CS-1 was contacted by Baltimore Police Department (BPD) Homicide

Division and was able to provide intimate information as it relates to the homicide of Williams. CS-1 provided a motive as well other relevant factors leading up to the homicide.

17. CS-1 has prior convictions, including a 2010 CDS admin equip poss/dis; a 2010 theft-scheme of $1,000 to under $10,000; a 2013 theft less than $1,000, a 2016 CDS possession-not marijuana; a 2017 prostitution-general; and a 2018 fraud-per ident avoid pros. Based on my knowledge, CS-1 does not have any pending charges and is not on government supervision. CS-1 is signed up as a cooperator through the Baltimore City Police Department and has been paid for participating in controlled purchases in this investigation.

18. CS-2 reached out to law enforcement when he/she learned there was an investigation into his/her drug trafficking activity. CS-2 has been providing law enforcement with verified information as it relates to drug trafficking, distribution, and violence. CS-2 has been federally indicted under seal for Conspiracy to Distribute and Possess with Intent to Distribute Heroin, Fentanyl, and Cocaine, in violation of 21 U.S.C. § 846. Law enforcement has been able to corroborate independently the information that CS-2 had previously provided.

19. CS-2 has prior convictions, including a 2001 second degree assault and a 2002 violation of an ex-parte/protective order.

20. Based on my knowledge, CS-2 does not personally know CS-1, but independently provided the same motive and mitigating factors as it related to Williams's homicide. Therefore, two separate and independent CSs were able to provide similar information on the incident.

## SEARCH WARRANT AT NELSON-SMITH'S RESISDENCE AT 7 TENTMILL LANE, PIKESVILLE, MARYLAND, 21208

21. On April 4, 2019, agents executed a federal search and seizure warrant at 7 Tentmill Lane, Pikesville, MD, **NELSON-SMITH's** residence. The officers located Devices #1 through #11 inside the residence.

22. Additionally, officers recovered a handgun, suspected narcotics and $6,675 in US Currency. As stated above, I believe there is probable cause to believe that electronic documents, email messages, text messages, call records, and other evidence related to narcotics trafficking will be found in Devices #1 through #11.

## CRIMINAL HISTORY

23. A check through the Criminal Justice Information System revealed that **NELSON-SMITH** has numerous narcotics convictions and a federal conviction for Felon in Possession of a Firearm.

   a. 1/25/2008 – Arrested by the United States Marshal Service for felon in possession of a firearm, convicted and sentenced to 72 months in prison and 36 months of supervised release.

   b. 5/28/2002 - Arrested by BPD for CDS-possession of firearms, guilty and sentenced to 5 years.

   c. 3/28/2002 - Arrested by BPD for CDS-unlawful manufacturing, guilty and sentenced to 5 years with 4 years and 11 months suspended and 3 years supervised release; 2 counts of Violation of Parole, guilty with no sentencing information.

   d. 7/13/2001 - Arrested by BPD for CDS-unlawful manufacturing, guilty and sentenced to 5 years imprisonment with 4 years and 11 months

suspended and 3 years' probation; two counts of Violation of Parole, guilty with no sentencing information.

## SEARCH WARRANT AT MATTHEWS' RESISDENCE AT 4106 LIBERTY HEIGHTS AVENUE, BALTIMORE, MARYLAND, 21207

24. On April 4, 2019, agents executed a federal search and seizure warrant at 4106 Liberty Heights Avenue, Baltimore, MD, **MATTHEWS's** residence. The officers located Devices #12 through #18 inside the residence.

25. Additionally, officers recovered a small amount of suspected narcotics and miscellaneous documents. As stated above, I believe there is probable cause to believe that electronic documents, email messages, text messages, call records, and other evidence will be found in Devices #12 through #18.

## CRIMINAL HISTORY

26. A check through the Criminal Justice Information System revealed that **MATTHEWS** has numerous narcotics convictions dating back to 1985.

   a. 1/26/2017 - Arrested by BPD for CDS—possession with intent manuf/dis/disp, guilty and sentenced to 8 years imprisonment with 7 years and 7 months suspended and 3 years' probation.

   b. 4/18/2012 - Arrested by BPD for CDS possession--not marijuana, guilty with no sentencing information.

   c. 7/5/2011 – Arrested by BPD for CDS possession--paraphernalia, guilty with no sentencing information.

   d. 2/20/2011 – Arrested by BPD for CDS unlawful possession etc., guilty and sentenced to 1 year with 11 months suspended and 1 year of probation.

10

e. 5/17/2008 – Arrested by BPD for CDS unlawful possession etc., guilty and sentenced to 2 years with 1 year and 11 months suspended and 2 years of probation.

f. 7/23/2004 – Arrested by BPD for CDS unlawful possession etc., guilty with no sentencing information.

g. 11/4/2000 – Arrested by BPD for CDS unlawful manufacturing etc., guilty and sentenced to 5 years with 8 months suspended and 3 years' probation.

h. 9/25/1996 – Arrested by BPD for battery, guilty and sentenced to 5 years; assault by threat, guilty and sentenced to 5 years; deadly weapon-int injure, guilty and sentenced to 3 years.

i. 7/24/1996 – Arrested by BPD for felony theft, guilty and sentenced to 5 years.

j. 10/1/1995 – Arrested by BPD for CDS-unlawful possession etc., guilty and sentenced to 4 years.

k. 4/17/1995 – Arrested by BPD for assault, guilty and sentenced to 4 years with 4 years suspended and 2 years' probation.

l. 4/6/1989 – Arrested by BPD for LSD, barb, cocaine, etc., guilty and sentenced to 4 years with 3 years and 6 months suspended and 4 years' probation.

m. 12/18/1985 – Arrested by Baltimore County Police for misdemeanor theft, guilty and sentenced to 3 years with 3 years suspended and 2 years' probation.

## **CONCLUSION**

27. Through my training and prior experience in drug trafficking investigations and arrests; I am familiar with the actions, traits, habits, and terminology utilized by drug traffickers. I am familiar with the ways in which narcotic traffickers conduct their business, including methods of importing and distributing narcotics, money laundering, the use of cellular telephones, electronic devices, and the Internet to facilitate their illegal acts, and the use of numerical codes and code words to conduct drug transactions.

28. CDS trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, CDS trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

29. CDS traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell. In that regard, your affiant knows that members of one cell commonly are provided with information only about their specific cell's criminal activities, thus limiting the information about the overall organization, and ultimately frustrating law enforcement efforts to dismantle the entire organization.

30. Cellular telephones and electronic devices are indispensable tools of the drug trafficking trade. CDS traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and CDS traffickers. CDS traffickers frequently use social

media to further their drug trafficking activities. They also often use their devices to take photographs, sometimes of currency, weapons, narcotics, and/or coconspirators.

31. CDS traffickers often place nominal control and ownership of telephones in names other that their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them. In addition, CDS traffickers will often change their cellphones following the arrest of a member of their drug trafficking organization (DTO), or at random in order to frustrate law enforcement efforts.

32. Based on my training and experience, I know that narcotics traffickers routinely use cellular telephones and electronic devices in the commission of narcotic transactions to communicate with their co-conspirators to advise the status of impending shipments of narcotics and/or to coordinate the pick-up of bulk currency in order to avoid seizure from detection and loss from theft. I know through my training and experience that these cellular telephones commonly retain telephone numbers and other text messages that are dialed or sent to the device.

33. Based on the information set forth in this affidavit, I submit that there is probable cause to believe that in Devices #1 through #18, there will be evidence of conspiracy to distribute narcotics and possession with intent to distribute and distribution of narcotics in violation of 21 U.S.C. §§ 846 and 841, respectively, such as contact names, addresses, phone numbers, times of contact, text messages, email messages, voicemail messages, photographs, evidence of travel and financial information, and other electronically stored information. I request permission to search Devices #1 through #18,

13

listed above and on Attachment A, for the information described and pursuant to the procedures outlined in Attachment B.

*[signature]*
Joshua Gottschalk,
Special Agent, Homeland Security Investigations

Sworn to before me this 12th day of April 2019.

*[signature]*
The Honorable A. David Copperthite
United States Magistrate Judge

## ATTACHMENT A

The following electronic devices are the subject of this warrant:

<u>Seized from 7 Tentmill Lane, Apartment K, Pikesville, Maryland, 21208 on April 4, 2019:</u>

    a.    One Rose Gold Samsung Cellular Phone; Model Number SM-J737P, IMEI# 354255098953492, ("Device #1");

    b.    One Black ZTE Cellular Phone; Model # N9137, Serial # 320377233173, IMEI# 990008902451165 ("Device #2");

    c.    One White Samsung Cellular Phone; Model # SM-J700P, DEC# 089483879105374065, HEX# 35562807520071 ("Device #3");

    d.    One Black Samsung Cellular Phone; Model # SM-J727P, DEC# 089268864805595282, HEX# 35355908556092, (Device #4);

    e.    One Silver LG Cellular Phone; Model # LS-770, DEC# 089663283806755159, HEX# 35718806671357, SN: 510CYBD0672157 ("Device #5");

    f.    One White Samsung Cellular Phone; Model # SPH-L710, DEC# 256691513704748694, HEX# 99000441487596, ("Device #6");

    g.    One Gold Samsung Cellular Phone; Model # SM-J320P, DEC# 089070874402119752, HEX# 35172308205848, ("Device #7");

    h.    One Black Samsung Cellular Phone; Model # SPH-M580, DEC# 268435460807001797, HEX# A00000306AD6C5 ("Device #8");

    i.    One Black Alcatel Tablet; Model # 9024W; IMEI: 014899004238944, ("Device #9");

    j.    One Black Amazon Kindle; IO: 9599A-0725, KCC-CMM: E48-D01100 ("Device #10");

    k.    One HP Laptop Computer; Model # HP255-G6, Serial # CND7510BWM ("Device #11");

<u>Seized from 4106 Liberty Heights Avenue, Baltimore, Maryland 21207, on April 4, 2019:</u>

    l.    One Black Alcatel TracFone; Model # A574BL; IMEI: 014913002557948, ("Device #12");

  m. One Black Coolpad Cellular Phone; Model # Coolpad 3320A; IMEI: 867441022871428, ("Device #13");

  n. One Silver Samsung Cellular Phone; Model # SM J327A; Serial # R28J43R0XRY, IMEI: 354775080845562, ("Device #14");

  o. One White Samsung Cellular Phone; Model # SM J700T; Serial # R58H83ME8ZY, IMEI: 357218/07/545194/5, ("Device #15");

  p. One White HTC Cellular Phone; Serial # FA4CASR04131, HEX: 99000501512619, DEC: 256691532905318169, ("Device #16");

  q. One Black Samsung Cellular Phone; Model # SAMR800, #24702610067, #F727D393, ("Device #17"); and

  r. One Black LG Cellular Phone (Flip Phone); Model # LG5600, #06803503627, #443576013, ("Device #18").

(Collectively, the "SUBJECT DEVICES").

## **ATTACHMENT B**

1. All records on the SUBJECT DEVICES described in Attachment A, including:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d. any information regarding the schedule or travel of drug couriers;

   e. all bank records, checks, credit card bills, account information, and other financial records.

2. Any and all records related to the location of the user(s) of the devices.

3. For each of the Devices:

   a. evidence of who used, owned, or controlled the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

   e. evidence of counter forensic programs (and associated data) that are designed to eliminate data from the Devices;

   f. evidence of the times the Devices were used;

    g. passwords, encryption keys, and other access devices that may be necessary to access the Devices;

    h. documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

    i. contextual information necessary to understand the evidence described in this attachment.

    4. With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

    a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

    b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

    c. "scanning" storage areas to discover and possible recover recently deleted files;

    d. "scanning" storage areas for deliberately hidden files; or

    e. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

    5. If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.